[No. G035851. Fourth Dist., Div. Three. June 28, 2006.]

PEAK INVESTMENTS et al., Respondent, v.
SOUTH PEAK HOMEOWNERS ASSOCIATION, INC., Appellant.

**COUNSEL**

Borton, Petrini & Conron, Matthew J. Trostler, Casandra P. Cushman; Hickey & Petchul and Dirk Petchul for Appellant.

Garrison & McInnis, Gregory M. Garrison, Amelia A. McDermott and Andrew R. Chivinski for Respondent.

## OPINION

**SILLS, P. J.**—South Peak Homeowners Association (the Association) appeals from the trial court's order granting a homeowner's petition to reduce the percentage of homeowner votes needed to approve an amendment to the declaration of covenants, conditions, and restrictions (CC&R's). The Association claims the trial court improperly reduced the percentage to less than a simple majority of the homeowner votes. We find the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.) requires that a proposed amendment to the CC&R's be approved by at least a simple majority of the total votes in the homeowners association before the trial court can reduce the percentage of votes set by the CC&R's. Accordingly, we reverse.

### FACTS

Peak Investments and Norman and Rita Lesman (the Lesmans) own lot No. 43 in South Peak, a planned community of custom homes in Laguna Niguel comprising 63 lots. The Association is governed by CC&R's recorded in April 1984. In 1986, the Association amended the CC&R's to change the building heights for each lot (CC&R's, § 6.7.1) and the setback provisions for each lot (CC&R's, § 6.7.2). These changes were reflected on exhibit 1 to the amendment, entitled "Height and Setback Limitations," which listed on a chart each lot number, its maximum height, its minimum setback from front lot line, its minimum setback from side lot lines, and its minimum setback from rear lot lines. The setback limit for lot No. 43's side lot lines was listed as "20-7," meaning the limit was 20 feet total minimum setback distance for both sides of the lot and 7 feet minimum setback distance for each side of the lot. The second page of exhibit 1 started with listing lot 31; all the lots from lot 31 through 55 had sideline setbacks of 25-7 except lot No. 43.

The CC&R's were amended again in 1990 to modify the building height limitations by removing the 35-foot cap (CC&R's, § 6.7.1). The amended section refers to attachment 2, which appears to be a retyped version of exhibit 1 to the 1986 amendment. The only difference in the two is the minimum sideline setback for lot No. 43; that number was changed from 20-7 to 25-7.

The Lesmans purchased lot 43 in June 2001 and apparently wanted to build a larger structure than the 20-7 setback allowed. They contacted the lawyer who prepared the 1990 amendment, Edward Coss, who wrote to the Association's board of directors in May 2002, opining that the change in the sideline setback on lot No. 43 was "an inadvertent typographical error." Coss explained, "I can find no record or other communication to support the change in the side lot lines; in fact, the purpose of Amendment Number Three

was limited to building height alterations." Coss enclosed a proposed amendment to the CC&R's to correct the error for the Association's approval.

For whatever reason, the board declined to effect the execution of the amendment. In July 2004, the Lesmans proposed an amendment to change the setback for their lot. In accordance with the bylaws, they caused a special meeting of the homeowners to be called to vote on the proposed amendment. The homeowners received a copy of the proposed amendment, which explained the requested change from 25-7 to 20-7; they also received a ballot allowing them to approve or disapprove the amendment or abstain from voting. The ballot noted, "[A]t least 25 percent (25%) of the voting power of the membership (16/63) must be present in person or by proxy in order to achieve a quorum. The written approval of at least 2/3rds of the Members (42 of 63) must be received for the proposed amendment to be approved."

The meeting was held on July 29, 2004, with 17 homeowners physically present. Thirty-two ballots were cast: 21 voted in favor of the amendment, and 11 voted against it. Because an amendment to the CC&R's requires the votes of two-thirds of the lot owners (CC&R's, § 14.2), the proposed amendment failed.

The Lesmans petitioned the superior court to reduce the percentage necessary to amend the CC&R's because the CC&R's required a "supermajority" to amend and not enough members attended the special meeting, and to confirm the amendment as validly approved. (Civ. Code, § 1356.) The trial court granted the petition, finding that more than 50 percent of the voters voted in favor of the amendment, as required by the statute. "[I]t seems to me . . . that this is what [section] 1356 was meant to apply to, the situation where you can't get enough people interested to be there to provide for super majority. [¶] It isn't like enough people came and voted against it. There just isn't [*sic*] that many votes. . . . [T]he only question here is whether 50 percent of the voters voted in favor of the amendment. It appears to me they did, 21 out of 32 or 33." The court also found the amendment was reasonable, another statutory requirement. The Association appeals from the order granting the petition.

## DISCUSSION

 Civil Code section 1356, part of the Davis-Stirling Common Interest Development Act (the Act), provides that a homeowners association, or any member, may petition the superior court for a reduction in the percentage of affirmative votes required to amend the CC&R's if they require approval by "owners having more than 50 percent of the votes in the association . . . ."

(Civ. Code, § 1356, subd. (a).)[1] The court may, but need not, grant the petition if it finds all of the following: Notice was properly given; the balloting was properly conducted; reasonable efforts were made to permit eligible members to vote; "[o]wners having more than 50 percent of the votes, in a single class voting structure, voted in favor of the amendment"; and "[t]he amendment is reasonable." (§ 1356, subd. (c)(1)–(5).)

On appeal, the Association contends the trial court erred in making an affirmative finding that more than 50 percent of the owners voted in favor of the amendment. It argues the statute requires an affirmative vote by more than 50 percent of *all* owners, whether or not they attended the meeting (i.e., 32 out of 63), while the trial court mistakenly construed the requirement to be merely more than 50 percent of the owners who attended the meeting (i.e., 17 out of 32).

■ In construing a statute, we must ascertain the intent of the Legislature. The first step in the process is to look at the plain meaning of the words used. (*Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 82 [14 Cal.Rptr.3d 67, 90 P.3d 1223].) " ' "If there is no ambiguity in the language of the statute, 'then the Legislature is presumed to have meant what it said.' " ' " (*Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 358 [127 Cal.Rptr.2d 516, 58 P.3d 367].)

The phrase in question here is "owners having more than 50 percent of the votes," appearing in section 1356, subdivision (c)(4). The phrase is unqualified by language indicating "the votes" are those cast at a meeting; in the absence of such qualification, it must mean total votes in the Association.

Our interpretation is buttressed by language in other sections of the Act that carefully defines votes cast at a meeting. For example, section 1355.5 allows the board of directors of an association to adopt an amendment to the governing documents deleting "any provision which is unequivocally designed and intended, or which by its nature can only have been designed or intended, to facilitate the developer in completing the construction or marketing of the development." (§ 1355.5, subd. (a).) However, the board may not adopt such an amendment "without the approval of the owners, casting a majority of the votes at a meeting or election of the association constituting a quorum . . . . For the purposes of this section, 'quorum' means more than 50 percent of the owners who own no more than two separate interests in the development." (§ 1355.5, subd. (d).) Likewise, a rule change by the board of directors of an association may be reversed "by the affirmative vote of a majority of the votes represented and voting at a duly held meeting at which

---

[1] All statutory references are to the Civil Code.

a quorum is present (which affirmative votes also constitute a majority of the required quorum) . . . ." (§ 1357.140, subd. (c).) And absent statutory notice (§ 1365), the board of directors of an association cannot levy assessment increases without the "approval of owners, constituting a quorum, casting a majority of the votes at a meeting or election of the association . . . ." (§ 1366, subds. (a) & (b).)

If a declaration fails to include provisions permitting its amendment, the Act provides that it may be amended after, inter alia, "the approval of owners representing more than 50 percent . . . of the separate interests in the common interest development has been given . . . ." (§ 1355, subd. (b).) Thus, it appears the Legislature made a conscious decision to provide that a bare majority of all the members would be the minimum required to amend the declaration. The comments to the Restatement of Property explain, "The declaration for a common-interest community functions like a constitution for the community. Like a constitution, the declaration should not be subject to change upon temporary impulse. Unlike rules, which can be adopted with a simple majority of votes cast, amendments require at least a majority of all votes that could be cast, and many types of amendment require substantially more." (Rest.3d Property, Servitudes (2000) § 6.10, com. a.)

The Restatement includes a section entitled "Judicial Power to Excuse Compliance with Requirements of the Governing Documents." The section provides that "[a] court may excuse compliance with any of the following provisions in a governing document if it finds that the provision unreasonably interferes with the community's ability to manage the common property, administer the servitude regime, or carry out any other function set forth in the declaration, and that compliance is not necessary to protect the legitimate interests of the members or lenders holding security interests: [¶] . . . [¶] (4) a provision requiring approval of more than two-thirds of the voting power to adopt an amendment . . . ." (Rest.3d Property, Servitudes, *supra*, § 6.12.) The section's notes state, "The rule that quorum and supermajority requirements may be waived if necessary to permit adoption of amendments necessary to continued existence and proper functioning of the association is based on California Civil Code §§ 1356 and 1357, although it differs in some particulars." (*Ibid.*, reporter's notes.) Notably, the Restatement section does not require the court to make threshold findings before it can exercise its discretion, as does section 1356.

There is no case law directly on point. The closest is *Blue Lagoon Community Assn. v. Mitchell* (1997) 55 Cal.App.4th 472 [64 Cal.Rptr.2d 81], in which this court held that a proceeding pursuant to section 1356 was not "adversarial" so as to entitle the party successfully opposing the petition to attorney fees as the prevailing party in an action to enforce the governing

documents of a common interest development. (§ 1354, subd. (c).) In so holding, this court commented: "[T]he purpose of Civil Code section 1356 is to give a property owners' association the ability to amend its governing documents when, because of voter apathy or other reasons, important amendments cannot be approved by the normal procedures authorized by the declaration. [Citation.] In essence, it provides the association with a safety valve for those situations where the need for a supermajority vote would hamstring the association." (55 Cal.App.4th at p. 477.)

█ It appears the legislative intent is to require at least a simple majority of all members of an association to amend the CC&R's. Accordingly, the trial court erred in finding that the affirmative votes of 21 out of 63 owners met the statutory prerequisite that owners having more than 50 percent of the vote voted in favor of the amendment. Because we reach this conclusion, we need not discuss the Association's contention that the amendment was not reasonable. We observe, however, that it appears the Lesmans may be merely attempting to correct a scrivener's error. Nothing in this opinion shall be construed to hamper their ongoing efforts in that regard.

## DISPOSITION

The order granting the petition is reversed. In the interest of justice, each party shall bear its own costs.

Rylaarsdam, J., and Fybel, J., concurred.